**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**ELKINS**

**KENNETH EUGENE SMITH,**

               Plaintiff,

**v.**

                                            **CIVIL ACTION NO.: 2:14-CV-00084**
                                            **(BAILEY)**

**CAROLYN W. COLVIN,**
**Acting Commissioner of Social**
**Security,**

               Defendant.

## REPORT AND RECOMMENDATION

## I.   INTRODUCTION

On November 5, 2014, Plaintiff Kenneth Eugene Smith ("Plaintiff"), through

counsel Jan Dils, Esq., filed a Complaint in this Court to obtain judicial review of the final

decision of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security

("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act,

as amended, 42 U.S.C. § 405(g) (2015). (Compl., ECF No. 1). On January 7, 2015, the

Commissioner, through counsel Helen Campbell Altmeyer, Assistant United States

Attorney, filed an Answer and the Administrative Record of the proceedings. (Answer,

ECF No. 6; Admin. R., ECF No. 7). On February 4, 2014, Plaintiff filed his Motion for

Summary Judgment and Brief in Support of Judgment on the Pleadings. (Pl.'s Mot. for

Summ. J. ("Pl.'s Mot."), ECF No. 10; Pl.'s Br. in Supp. of J. on the Pleadings ("Pl.'s Br."),

ECF No. 11). On March 4, 2015, the Commissioner filed her Motion for Summary

Judgment and Brief in Support of her Motion for Summary Judgment. (Def.'s Mot. for

Summ. J. ("Def.'s Mot."), ECF No. 14; Def.'s Br. in Supp. of her Mot. for Summ. J. ("Def.'s Br."), ECF No. 15). The matter has now been referred to the undersigned United States Magistrate Judge for a Report and Recommendation to the District Judge. 28 U.S.C. § 636(b)(1)(B) (2009); Fed. R. Civ. P. 72(b). For the reasons set forth below, the undersigned finds that substantial evidence supports the Commissioner's decision and recommends that the Commissioner's decision be affirmed.

## II. <u>PROCEDURAL HISTORY</u>

On September 20, 2011, Plaintiff protectively filed an application under Title XVI of the Social Security Act for Supplemental Security Income ("SSI") benefits, alleging disability that began on December 1, 2010. (R. 62, 153, 172). Plaintiff's claim was initially denied on January 12, 2012, and denied again upon reconsideration on February 3, 2012. (R. 93-96, 101-03). On February 16, 2012, Plaintiff filed a written request for a hearing, which was scheduled for July 12, 2013. (R. 106-08, 116). On this date, a video hearing was held before United States Administrative Law Judge ("ALJ") Jack Penca in Charleston, West Virginia. (R. 10, 20). James Barry Williams, an impartial vocational expert, appeared and testified in Charleston. (<u>See</u> R. 20, 138). Plaintiff, represented by counsel Linda Pettit, Esq., appeared and testified in Parkersburg, West Virginia. (<u>Id.</u>). On July 25, 2013, the ALJ issued an unfavorable decision to Plaintiff, finding that he was not disabled within the meaning of the Social Security Act. (R. 7-19). On September 10, 2014, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (R. 1).

## III. <u>BACKGROUND</u>

**A.    Personal History**

Plaintiff was born on December 24, 1963, and was forty-seven years old at the time he filed his claim for SSI benefits. (See R. 25). He completed the tenth grade and received his GED when he was nineteen years old. (R. 26). He never received any specialized, trade or vocational training. (Id.). Plaintiff's prior work experience includes working as a construction worker for various companies. (R. 52). He is married and resides with his wife and two of his three children, ages sixteen and eighteen. (R. 26). Plaintiff alleges disability due to the following impairments: (1) diabetes mellitus; (2) chronic obstructive pulmonary disorder ("COPD"); (3) visual anomalies and (4) anxiety. (See Pl.'s Br. at 2-6, 8-9).

**B.    Medical History**

### 1.    Medical History Pre-Dating Alleged Onset Date of December 1, 2010

On March 22, 2007, Plaintiff underwent a routine eye examination. (R. 363). During this examination, Plaintiff was noted to wear prescription eyeglasses. (Id.). Additionally, Plaintiff's visual acuity was noted as 20/30 in both eyes, both while aided with prescription eyeglasses and unaided. (Id.). At the end of the examination, Plaintiff was prescribed Travatan eye drops to reduce the pressure in his eyes. (See id.).

On October 11, 2010,[1] Plaintiff presented to Robert N. Christen, II, O.D., of Sistersville Eye Care Center, Inc., complaining of blurry vision. (R. 250). During this visit, Plaintiff stated that he had experienced blurry vision in both of his eyes for the previous two to three years. (Id.). He described the severity as "mild." (Id.). An eye examination revealed that, unaided, Plaintiff's near vision was 20/60 in both eyes and far vision was 20/20 in both eyes. (Id.). Dr. Christen changed Plaintiff's eyeglass

---

[1] No medical records were submitted for the time period between March 22, 2007, and October 11, 2010.

prescription and ordered that Plaintiff undergo blood work to rule out diabetes mellitus. (See R. 250, 232).

On November 6, 2010, Plaintiff presented to Wetzel County Hospital for blood work. (Id.). The results showed a high fasting blood glucose level of 304 mg/dL and a high hemoglobin A1c ("Hgb A1c") level of 11.1%. (Id.). Plaintiff's high Hgb A1c level triggered an evaluation for diabetes mellitus. (See id.).

### 2. Medical History Post-Dating Alleged Onset Date of December 1, 2010

On December 13, 2010, Plaintiff presented to Rogelio O. Bantug, M.D., of Sistersville General Medical Center Family Practice, to undergo an evaluation for diabetes mellitus. (R. 228-29). After the evaluation was performed, Dr. Bantug diagnosed Plaintiff with "[t]ype II diabetes mellitus." (R. 229). Dr. Bantug prescribed metformin and "an 1800 to 2000-calorie diabetic diet." (Id.). Additionally, Dr. Bantug advised that Plaintiff keep a log of his daily fasting blood glucose levels. (Id.).

On April 7, 2011, Dr. Bantug ordered follow-up blood work. (R. 231). Plaintiff presented to Sistersville General Hospital to have his blood drawn. (Id.). The results showed a high blood glucose level of 193 mg/dL and a high Hgb A1c level of 8.3%. (Id.). Plaintiff was instructed to continue taking metformin. (Id.).

On September 13, 2011, Plaintiff presented to the emergency room at Sistersville General Hospital, complaining of difficulty breathing and feeling a "lump in [his] throat." (R. 223-27, 261-62). Plaintiff reported that he had drunk a large amount of whiskey the night before and had vomited three or four times. (R. 262). Plaintiff's blood was drawn, revealing a blood alcohol level of 0.05 g/dL. (R. 226). Plaintiff was advised to drink fluids and to avoid consuming alcohol for the next twenty-four hours. (See R. 227).

On October 11, 2011, Plaintiff presented to the emergency room at Wetzel County Hospital, complaining that he had awakened in a cold sweat that night and was hearing "ringing in [his] ears." (R. 251-60). Plaintiff was diagnosed with an anxiety attack and swimmer's ear. (R. 260). After Ativan and ear drops were prescribed, Plaintiff was discharged home. (R. 259-60).

On December 13, 2011, Plaintiff presented to Wetzel County Hospital's New Martinsville Clinic for a "cardiac status, pulmonary status, and diabetes" evaluation. (R. 243-48). Thomas J. Schmitt, M.D., an internal medicine specialist, performed the evaluation. (R. 243, 248). When Dr. Schmitt interviewed Plaintiff regarding his symptoms, Plaintiff stated that he had experienced "left lateral chest pain and numbness in [his] left arm" for several months. (R. 243). Plaintiff also stated that he was experiencing shortness of breath upon exertion and that he had smoked two-and-a-half packs of cigarettes a day until the age of thirty-six, when he quit smoking. (R. 243, 246). After the interview, Dr. Schmitt performed a head-to-toe physical assessment, which revealed mostly normal findings. (See R. 244-45). In fact, Dr. Schmitt documented only two abnormal findings. (See R. 244, 246). First, Dr. Schmitt noted that Plaintiff suffers from "[m]inimal [o]bstructive [a]irways [d]isease," which was revealed by a pulmonary function test. (See R. 240, 246). Second, Dr. Schmitt noted that, unaided, Plaintiff's visual acuity was 20/50 in his right eye and 20/70 in his left eye. (R. 244). After the evaluation, Dr. Schmitt diagnosed Plaintiff with: (1) type II diabetes mellitus with no evidence of end-organ damage and (2) exertional dyspnea secondary to probable emphysema and a long history of smoking. (R. 245-46). Regarding Plaintiff's cardiac

status, Dr. Schmitt documented that he had found no symptoms of cardiac disease, although he recommended that Plaintiff undergo further cardiac evaluation.[2] (R. 246).

On December 15, 2011, Plaintiff returned to Dr. Christen's office for an eye examination. (R. 249-50). During this visit, Plaintiff reported that his vision was blurry and that he "sees gray spots." (R. 249). Dr. Christen documented that, unaided, Plaintiff's near vision was 20/60 in both eyes and that his far vision was 20/25 in both eyes. (Id.). Dr. Christen prescribed eye drops and new eyeglasses. (Id.).

On February 29, 2012, Plaintiff presented to the emergency room at Wetzel County Hospital, complaining of chest pain and "a 'knot' in his throat." (R. 276). Plaintiff was admitted to the hospital and placed on a cardiac monitor. (R. 283). A chest X-ray and electrocardiogram ("EKG") were performed, both of which showed normal results. (See R. 274, 278-82). Subsequently, Plaintiff was diagnosed with a panic attack, prescribed Zantac for possible heartburn and discharged home. (See R. 287-88).

On March 13, 2012, Plaintiff again returned to Dr. Christen's office for an eye examination, complaining of blurry vision and that "[e]verything looks white in the [morning] for about two minutes." (R. 291-98). During the examination, Dr. Christen noted clinically significant macular edema as well as diabetic retinopathy. (R. 297). However, Dr. Christen further noted that Plaintiff did not experience any blurred or double vision during the examination. (See R. 292). Finally, Dr. Christen noted that Plaintiff's visual acuity was 20/30 in his right eye, 20/25 in his left eye and 20/25 in both eyes. (R. 294).

---

[2] Dr. Schmitt also documented that, despite being advised by Dr. Bantug to follow "an 1800 to 2000-calorie diabetic diet," Plaintiff follows no set diet. (R. 229, 243).

On March 30, 2012, Plaintiff began seeking primary care from Wheeling Health Right. (See R. 299). On April 29, 2012, Shawn K. Tipton, an Advanced Practice Nurse, ordered that Plaintiff undergo blood work for diabetic monitoring. (R. 301, 352-53). The results showed a normal blood glucose level of 101 mg/dL and a normal Hgb A1c level of 6.1%. (R. 352-53). The Hgb A1c result was documented as a "therapeutic/non-diabetic" level. (R. 353).

On July 13, 2012, Plaintiff presented for a follow-up appointment at Wheeling Health Right. (R. 335-36). During this appointment, Plaintiff complained of chest pain, panic attacks and "[e]xtreme anxiety over [both his and] his parents' health." (R. 335). Plaintiff further complained of experiencing right calf pain whenever he walked more than a short distance. (Id.). Amanda Cummins, a Physician's Assistant ("PA-C Cummins"), evaluated Plaintiff, noting that his diabetes mellitus was well-controlled and that he had undergone at least five EKGs the previous year, all of which were normal. (Id.). PA-C Cummins also noted that Plaintiff's blood pressure reading was elevated. (Id.).

On August 30, 2012, Plaintiff presented to the West Virginia University Eye Institute after being referred by Wheeling Health Right. (R. 346-48). An eye examination was performed, revealing normal physical findings. (R. 347). However, Plaintiff's far vision, aided, was documented as 20/32 in his right eye and 20/40 in his left eye, while his near vision, also aided, was documented as 20/50 in both eyes. (R. 346). After the examination, Plaintiff was referred to an ophthalmologist. (R. 347).

On August 31, 2012, Plaintiff presented to Wheeling Health Right for a scheduled appointment. (R. 330-31). During this appointment, PA-C Cummins added benign

essential hypertension to Plaintiff's list of diagnoses and noted that Plaintiff was previously prescribed lisinopril, an antihypertensive medication. (See R. 330). PA-C Cummins further noted that Plaintiff appeared fatigued and "a bit anxious" throughout the appointment. (Id.).

On September 20, 2012, Plaintiff presented to M. F. Anwar, M.D., of Anwar Cataract Center, after being referred by Wheeling Health Right. (R. 329). Dr. Anwar performed a "[d]iabetic and glaucoma [screening]" of Plaintiff. (Id.). During the screening, an eye examination was performed, revealing that Plaintiff's visual acuity, unaided, was 20/20 in both his right eye and his left eye. (Id.). In a report to Wheeling Health Right, Dr. Anwar diagnosed Plaintiff with the following: non-insulin dependent diabetes with mild background diabetic retinopathy of both eyes; early stages of cataracts in both eyes and glaucoma with elevated intraocular pressure in both eyes. (Id.). Dr. Anwar denied observing evidence of nerve fiber thinning and prescribed Lumigan eye drops. (Id.).

Over the next several months, Plaintiff continued to receive routine care at Wheeling Health Right. On September 28, 2012, James Comerci, M.D., ordered that Plaintiff undergo blood work for diabetic monitoring. (See R. 338-43). The results showed a high blood glucose level of 165 mg/dL and an Hgb A1c level of 7.1%, which indicated "good [diabetic] control." (R. 340-41). On November 30, 2012, Amanda Cummins increased Plaintiff's prescription of lisinopril after Plaintiff's blood pressure was noted to be elevated. (R. 362).

In January and May of 2013, Plaintiff returned to Dr. Anwar's office for follow-up eye appointments. On January 24, 2013, Dr. Anwar noted that Plaintiff had 20/20 visual

acuity in both eyes. (R. 354). On May 23, 2013, Dr. Anwar noted that, while a corneal pachymetry revealed "[t]hick" corneas, Plaintiff's visual acuity was again 20/20 in both eyes. (R. 355-56).

### 3. Medical Reports/Opinions

#### a. Disability Determination Examination by Frank Bettoli, Ph.D., December 12, 2011

On December 12, 2011, Frank Bettoli, Ph.D., a licensed psychologist, performed a disability determination examination of Plaintiff, concluding that Plaintiff suffers from both physical and mental impairments. (R. 233-37). The physical impairments included: type II diabetes mellitus, arthritis, shortness of breath, visual anomalies and motor control problems. (R. 236-37). The mental impairments included: anxiety disorder and adjustment disorder with mixed anxiety and depressed mood. (Id.).

During the examination, Dr. Bettoli interviewed Plaintiff regarding his symptoms. Plaintiff informed Dr. Bettoli that he suffers from headaches, shortness of breath, "burning" in his shins, an inability to "walk for very long," difficulty with motor control, failing vision, anxiety, insomnia and joint aches, pains and cramps. (R. 234-35). Regarding his anxiety, Plaintiff reported that he awakens at night in a cold sweat and feels a need to pace the floor. (R. 234). He further reported that he will occasionally vomit due to his anxiety and that he only sleeps well two or three nights per week. (Id.). In addition to anxiety, Plaintiff declared that he feels depressed at times, avoids crowds and has difficulty controlling his moods and interacting with strangers. (Id.). Plaintiff clarified, however, that his variable moods precede his date of onset, as he has "always had [this] problem[]." (Id.). He estimated that his mental symptoms, excluding the variable moods, began the prior year when "he learned that he ha[d] diabetes." (Id.). He

explained that he tends to worry "about his ailments or what he is going to do with himself during the day," as well as "how he is going to make ends meet." (R. 235).

Dr. Bettoli also interviewed Plaintiff regarding how his symptoms limit his daily activities. Plaintiff reported that in a typical day "he . . . just stays in his room all day," although "at times he might clean up around the house or do some light chores." (R. 236). Dr. Bettoli noted that Plaintiff "was somewhat vague" when asked about his daily activities. (Id.).

After interviewing Plaintiff regarding his symptoms and limitations, Dr. Bettoli performed a thorough mental assessment of Plaintiff. While Plaintiff's mood was anxious during the assessment, Dr. Bettoli noted that Plaintiff presented as alert, oriented, cooperative and "generally spontaneous and open" when responding to questions. (R. 233, 235-36). Dr. Bettoli also noted that Plaintiff's thought processes were logical and goal-oriented and that Plaintiff's concentration, persistence and pace were either "[g]ood" or "[w]ithin normal limits." (R. 236). Finally, Dr. Bettoli noted that Plaintiff's social functioning during the examination was within normal limits and that Plaintiff "made good eye contact [and] . . . was able to dialogue [while being] generally personable." (Id.).

After the assessment, Dr. Bettoli analyzed Plaintiff's mental health prognosis. Dr. Bettoli emphasized that, at that point in time, Plaintiff had "not engaged in any help seeking with [the] mental health system," even though he "may benefit from doing so." (R. 237). Dr. Bettoli opined that, if Plaintiff seeks mental health treatment, then Plaintiff's anxiety and mood instability may improve, which may in turn improve his mental and emotional functioning. (Id.).

### b. Disability Determination Explanation by Atiya M. Lateef, M.D., January 10, 2012

Atiya M. Lateef, M.D., a state agency medical consultant, prepared Plaintiff's Disability Determination Explanation ("the Explanation") at the Initial level. (R. 62-71). In preparing the Explanation, Dr. Lateef reviewed Plaintiff's medical records, treatment notes and Adult Function Report. (R. 63-64). After reviewing these documents, Dr. Lateef concluded that Plaintiff suffers from the following severe medical impairments: diabetes mellitus, COPD, affective disorders and alcohol/substance addiction disorders.[3] (R. 66). Dr. Lateef further concluded that Plaintiff's statements regarding his symptoms and limitations are only "[p]artially [c]redible" because they are not "substantiated by the objective medical evidence." (R. 67).

In the Explanation, Dr. Lateef completed a physical residual functional capacity ("RFC") assessment of Plaintiff, determining that Plaintiff is capable of performing reduced to medium level work with certain limitations. (R. 67-69). Dr. Lateef found that, while Plaintiff possesses no postural, manipulative, visual or communicative limitations, Plaintiff does possess exertional and environmental limitations. (R. 68). Regarding Plaintiff's exertional limitations, Dr. Lateef found that Plaintiff is able to: (1) occasionally lift and/or carry fifty pounds; (2) frequently lift and/or carry twenty-five pounds; (3) stand and/or walk for approximately six hours in an eight-hour workday; (4) sit for approximately six hours in an eight-hour workday and (5) push and/or pull with no limitations. (Id.). Regarding Plaintiff's environmental limitations, Dr. Lateef found that Plaintiff must avoid concentrated exposure to extreme heat, extreme cold, wetness,

---

[3] Dr. Lateef diagnosed Plaintiff with alcohol/substance addiction disorders after noting that Plaintiff presented to the emergency room at Wetzel County Hospital on September 13, 2011, after consuming a large amount of whiskey and vomiting three or four times. (See R. 65, 262).

humidity and "[f]umes, odors, dusts, gases, poor ventilation, etc." (Id.). Dr. Lateef further found that Plaintiff need not avoid exposure to noise, vibrations or hazards. (R. 68-69).

Dr. Lateef also analyzed Plaintiff's relevant work history in the Explanation. Dr. Lateef noted that Plaintiff has worked as a roofer, dry wall hanger and, most recently, a carpenter. (R. 69). Dr. Lateef determined that Plaintiff is unable to perform his past relevant work. (R. 70). However, Dr. Lateef further determined that Plaintiff is capable of working as a can filler, box bender and stubber. (Id.).

Finally, in the Explanation, John Todd, Ph.D., a licensed psychologist, completed a Psychiatric Review Technique assessment, opining that Plaintiff's mental limitations are non-severe in nature. (R. 66). In his assessment, Dr. Todd found that Plaintiff is "mostly credible" regarding his mental symptoms and limitations. (Id.). Additionally, Dr. Todd noted four principal findings.[4] (See id.). First, Dr. Todd noted that the restrictions caused by Plaintiff's mental impairments on his activities of daily living are mild. (Id.). Second, Dr. Todd noted that Plaintiff has no difficulty maintaining social functioning. (Id.). Third, Dr. Todd noted that Plaintiff has no difficulty maintaining concentration, persistence or pace. (Id.). Fourth, Dr. Todd noted that Plaintiff experiences no repeated or extended episodes of decompensation. (Id.).

On February 2, 2012, Porfirio Pascasio, M.D., prepared Plaintiff's Disability Determination Explanation at the Reconsideration level. (R. 83-91). In this explanation, Dr. Pascasio affirmed Dr. Lateef's evaluation and findings, including the physical RFC assessment. (R. 89). Additionally, Paula J. Bickham, Ph.D., affirmed Dr. Todd's Psychiatric Review Technique assessment. (R. 87).

---

[4] These findings depict the four "paragraph B" criteria, discussed in Part VI.C.1.b.i, which are used when evaluating the severity of a claimant's mental impairments.

**C.    Testimonial Evidence**

At the administrative hearing held on July 12, 2013, Plaintiff divulged his relevant personal facts. (R. 20, 26). Plaintiff was born on December 24, 1963, and was forty-nine years of age at the time of the hearing. (R. 25-26). He is 6' tall and weighs 250 pounds. (R. 26). He is married and lives in a "trailer [that he] built into a house" with his wife and two of his three children, ages sixteen and eighteen. (Id.).

At the hearing, Plaintiff testified regarding his educational background and prior work experience. Plaintiff quit school after completing the tenth grade and obtained his GED at age nineteen. (Id.). He has never received any specialized, trade or vocational training. (Id.). Plaintiff's employment history includes working as a construction worker for various companies. (R. 52). Most recently, Plaintiff worked for AAA Homes, where he "[did] roofing, siding . . . and helped put trailers together." (R. 27). Plaintiff was laid off from this position due to unavailability of work but states that the timing was convenient because his impairments were becoming troublesome. (R. 28-29). He explains that, prior to his discharge, he was having difficulty climbing onto roofs and could no longer see well enough to run "a skill saw." (R. 28, 34).

Plaintiff testified that he suffers from multiple impairments. One such impairment is diabetes mellitus. (R. 28, 32). Plaintiff's blood glucose level has dropped as low as 73 mg/dL "a couple of times" and has risen as high as 310 mg/dL. (R. 33-34). Despite these fluctuations, Plaintiff states that his blood glucose level is typically stable, remaining slightly higher than normal most days. (R. 32-33). When his blood glucose level is elevated, he becomes dizzy. (R. 33).

A second impairment from which Plaintiff suffers is numbness and pain in the lower extremities. (R. 30). Plaintiff explains that his legs "just ache and burn" and that his feet are constantly numb. (R. 30, 47). He describes his right leg pain as more severe than his left. (R. 47). Plaintiff states that these symptoms restrict his physical activity. (See R. 30-49). For example, while Plaintiff does not require an assistive device, he is unable to walk further than the length of one city block without resting. (R. 30, 46-47). Additionally, he is unable to bend over at the waist, stand for longer than fifteen minutes or squat, kneel or stoop if he cannot grab "hold of something to [pull himself] back up." (R. 47, 49). Plaintiff uses only ibuprofen to treat his leg pain. (R. 32).

A third impairment from which Plaintiff suffers is pain and tingling in the upper extremities. (R. 31, 48-51). Plaintiff declares that he experiences pain in his shoulders and elbows and a tingling sensation in his hands. (Id.). Regarding his shoulder and elbow pain, Plaintiff characterizes the pain as "joint pain." (R. 31). Due to this pain, Plaintiff is unable to reach out with his arms for long periods of time. (R. 51). He also struggles when lifting twenty-pound objects and is unable to lift objects heavier than twenty-pounds. (R. 48-49). As for his hands, Plaintiff states that, in addition to the tingling sensation, his hands occasionally "lock up." (R. 49, 51). However, despite these abnormalities, Plaintiff is able to grip and lift objects, although he has difficulty with coins. (R. 50-51).

A fourth impairment from which Plaintiff suffers is visual anomalies, which Plaintiff believes worsened in the months prior to the administrative hearing. (R. 34-36, 46). Plaintiff declares that his vision "is white" when he awakens in the morning. (R. 34). He further declares that, without eyeglasses, his peripheral vision is blurry. (R. 35).

While Plaintiff owns three sets of eyeglasses to correct his blurry vision, he states that "sometimes [he] can see out of one [of his eyeglasses] and sometimes [he] can't." (R. 34-35). On two occasions, no set of eyeglasses proved effective and so Plaintiff "tr[ied] to] stay in bed" all day. (R. 35). At times, Plaintiff's visual anomalies cause him to lose his balance. (R. 46). He recalls falling "two or three times in the last year or two." (R. 46).

A fifth impairment from which Plaintiff suffers is anxiety. (R. 38-39). Plaintiff states that he suffers from panic attacks at night but that the attacks are not caused by "anything in particular." (R. 40). During a panic attack, Plaintiff feels "like [he is] having a heart attack." (Id.). Plaintiff is prescribed trazodone for his anxiety, which he takes every night and "double[s] . . . up" when experiencing an acute episode of anxiety. (R. 39. 41). Plaintiff declares that this medication is effective, although it "makes [him] sleepy." (R. 39-40).

Finally, Plaintiff testified that he suffers from headaches. (R. 37). Plaintiff's headaches, which started three to four months prior to the hearing, do not appear to follow a pattern. (Id.). When they occur, Plaintiff feels like his head is "going to explode." (Id.). The duration of the headaches varies, ranging from five minutes to a half-hour or an hour. (Id.). Plaintiff has not yet informed a health care provider of his headaches. (Id.). He uses ibuprofen to treat the pain. (Id.).

Plaintiff described how his impairments affect his day-to-day life. Plaintiff's typical day begins at 4:30 A.M. when he awakens with his wife while she prepares for work. (R. 42). At this time, Plaintiff takes his daily medications and then falls back asleep until 11:00 A.M. (Id.). At 11:00 A.M., Plaintiff eats breakfast and checks his blood glucose

level. (R. 32). Afterwards, Plaintiff "watch[es] TV all day" and goes to bed around 10:00 PM or 10:30 P.M. after taking trazodone. (R. 41-42). Occasionally, Plaintiff will walk with his wife to a grocery store located one block away from his home or operate a motor vehicle independently. (R. 46, 52).

**D.    Vocational Evidence**

**1.  Vocational Testimony**

James Williams, an impartial vocational expert, also testified at the administrative hearing. (R. 20, 53-61). Mr. Williams characterized Plaintiff's most recent employment position as a construction worker as very heavy, unskilled. (R. 56). As for Plaintiff's prior work as a carpenter, roofer and drywall hanger, Mr. Williams characterized all three positions as heavy, semi-skilled. (Id.). Regarding Plaintiff's ability to return to his prior work, Mr. Williams gave the following response to the ALJ's hypothetical:

> Q:    [A]ssume an individual of the claimant's age, education, and work history who could perform work at the medium exertional level [but with the following limitations:]
>
> [M]ust avoid concentrated exposure to cold, heat, wetness, humidity, fumes, odors, dust, gas, and poor ventilation.
>
> Could such an individual perform the claimant's past work?
>
> A:    No, sir.

(R. 56). Mr. Williams opined that such an individual could, however, perform other jobs. (Id.). Such jobs included assembler of motor vehicles, amusement park worker and automobile detailer. (R. 56-57). Mr. Williams declared that his statements are consistent with the Dictionary of Occupational Titles ("DOT"). (R. 53-54).

Plaintiff's counsel, Ms. Pettit, also presented hypothetical questions to Mr. Williams. Ms. Pettit asked that Mr. Williams consider an individual who must sit or stand

at will. (R. 57). Specifically, Ms. Pettit asked that Mr. Williams assume an individual who:

> Q:     [C]ould stand for 15 or 20 minutes and then would need to sit for 15 or maybe 20 or 30 minutes and then would have to stand again, so every 30 minutes, 20 to 30 minutes they shift position from standing to sitting.
>
> [A]re there any jobs that a person could do at any exertional level if they had to do that?
>
> A:     [Yes,] if they could be productive. If they are not productive . . . then there would be no jobs.

(R. 59). Incorporating the above hypothetical, Ms. Pettit then added two limitations for Mr. Williams to consider. (R. 60-61). The additional limitations included that the hypothetical individual be: (1) unproductive fifteen percent of the day and (2) absent from work two times a month. (Id.). Mr. Williams testified that he did not believe that such an individual would be employable with the addition of either limitation. (Id.). Mr. Williams further testified that the three limitations Ms. Pettit asked him to consider are not addressed in the DOT. (R. 57).

## 2. Disability Reports

On October 4, 2011, Plaintiff completed a Disability Report, declaring that he suffers from type II diabetes mellitus, chest pain and weak legs, all of which affect his ability to work. (R. 172-81). In the report, Plaintiff states that he stopped working on December 16, 2008, when he was laid off by his employer, although he believes that his impairments became severe enough to prevent him from working on December 1, 2010. (Id.). When describing his work history, Plaintiff reports that he has worked as a roofer, dry wall hanger and, most recently, a carpenter. (R. 177).

Plaintiff disclosed in his Disability Report that Rogelio O. Bantug, M.D., provides care to Plaintiff as a primary care physician. (R. 179). Plaintiff indicates that Dr. Bantug treats him for medical impairments only, not mental impairments. (Id.). Plaintiff further indicates that he has not received professional care for a mental impairment and that he does not have a future appointment scheduled to address such an impairment. (Id.). Plaintiff lists Glucotrol, lisinopril and metformin as his prescribed medications. (R. 178).

On January 20, 2012, Plaintiff submitted a Disability Report-Appeal form. (R. 190-97). In this report, Plaintiff updates his list of prescribed medications, adding Lumigan and trazodone to his previously reported medications. (R. 194). Additionally, Plaintiff implies that his symptoms have worsened. Plaintiff states:

> The only thing I do is lay in bed all day[,] maybe watch TV but [mostly stare] out the window. I don't go to the store anymore[,] [don't] help around the house anymore cause my legs ache and [I am] tired all the time. And I [can't] work because . . . I [can't] climb a latter [sic] and I can't see to read a tape measure."

(R. 195). Plaintiff further states that, due to Wheeling Health Right cancelling an appointment, he was unable to refill his medications at the time. (R. 196).

On February 10, 2012, Plaintiff's counsel Jan Dils, Esq., completed a second Disability Report-Appeal form for Plaintiff. (R. 198-205). In this report, Ms. Dils updates Plaintiff's list of diagnoses. (See R. 200). Specifically, Ms. Dils adds glaucoma, hypertension and panic attacks to Plaintiff's list of diagnoses. (Id.).

## E.     Lifestyle Evidence

On October 31, 2011, Plaintiff's wife, Connie Smith, completed an Adult Function Report for Plaintiff, in Plaintiff's presence. (R. 182-89). In this report, Ms. Smith states that Plaintiff is "[t]ired and weak all the time." (R. 182). She further states that Plaintiff

suffers from pain in his legs and feet, shortness of breath, hand cramps and declining eye sight. (Id.).

Ms. Smith explains how Plaintiff is limited in some ways but not others. In several activities, Plaintiff requires no or minimal assistance. (See R. 184-87). For example, Plaintiff is able to operate a motor vehicle and leave the house by himself. (R. 185). He is also able to go shopping for items like bread and milk and perform house and yard activities such as washing laundry and sweeping the porch, although he must be "encourage[d] . . . to do these things." (R. 184-85). Finally, Plaintiff has no difficulty concentrating or following written instructions and is able to administer his own medication, although he periodically requires reminding from Ms. Smith. (R. 184, 187).

While Plaintiff is able to perform some activities, Ms. Smith describes how others prove more difficult due to his physical limitations. (See R. 182, 187). For example, Plaintiff is unable to walk further than one city block before requiring rest, stand for extended periods of time, climb a ladder or hold a hammer. (R. 182, 187). Plaintiff also has difficulty lifting, squatting, bending, standing, reaching, walking, kneeling, climbing stairs and using his hands. (Id.).

In addition to physical limitations, Ms. Smith declares that Plaintiff possesses mental limitations. (See R. 183, 187-88). Plaintiff experiences "panic attacks" at night, during which he awakens in a cold sweat and paces the floor. (R. 183). Additionally, he has difficulty completing tasks, following spoken instructions and handling stress and changes to his routine. (R. 187-88). Finally, Plaintiff has difficulty getting along with others. (See R. 187-88). To illustrate, he does not "like being around a lot of people," instead preferring to isolate himself. (R. 187). However, Plaintiff's antipathy towards

social activities precedes his date of onset, as he has "all ways [sic] stayed to [him]self." (Id.).

Finally, Ms. Smith describes Plaintiff's daily activities. Plaintiff's day begins when he awakens, takes his prescribed medications[5] and eats breakfast. (R. 183). Plaintiff's breakfast is prepared by Ms. Smith, who cooks all of Plaintiff's meals. (R. 184). After breakfast, Plaintiff watches television "all day," although he goes for a walk outside once or twice per day. (R. 183, 185).

## IV.  THE FIVE-STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following criteria:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. . . . '[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A) (2004). The Social Security Administration uses the following five-step sequential evaluation process to determine whether a claimant is disabled:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a

---

[5] Plaintiff's daily medications include metformin, Glucotrol, lisinopril and lorazepam. (R. 189). Plaintiff experiences side effects from these medications, including dizziness, tiredness, headaches, chest pain, cold-like symptoms, nausea and bone pain. (Id.). In addition to medication, Plaintiff wears prescription eyeglasses when driving or reading. (R. 188).

combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, the [RFC] of the claimant is evaluated "based on all the relevant medical and other evidence in your case record . . . ."]

(iv) At the fourth step, we consider our assessment of your [RFC] and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your [RFC] and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520 (2015); 20 C.F.R. § 416.920 (2012). In steps one through four, the burden is on the claimant to prove that he or she is disabled and that, as a result of the disability, he or she is unable to engage in any gainful employment. Richardson v. Califano, 574 F.2d 802, 804 (4th Cir. 1978). Once this is proven, the burden of proof shifts to the Government during step five to demonstrate that jobs exist in the national economy that the claimant is capable of performing. Hicks v. Gardner, 393 F.2d 299, 301 (4th Cir. 1968). If the claimant is determined to be disabled or not disabled at any of the five steps, the process will not proceed to the next step. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.

## V.     ADMINISTRATIVE LAW JUDGE'S DECISION

Utilizing the five-step sequential evaluation process described above, the ALJ made the following findings:

1.    The claimant has not engaged in substantial gainful activity since September 20, 2011, the application date (20 CFR 416.971 *et seq.*).

2.    The claimant has the following severe impairments: [COPD] and diabetes mellitus (20 CFR 416.920(c)).

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.    After careful consideration of the entire record, I find that the claimant has the [RFC] to perform medium work as defined in 20 CFR 416.967(c) except he must avoid concentrated exposure to cold, heat, wetness, humidity, fumes, odors, dusts, gases, and poor ventilation.

5.    The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.    The claimant was born on December 24, 1963 and was 47 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.    The claimant has a general equivalency diploma and is able to communicate in English (20 CFR 416.964).

8.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9.    Considering the claimant's age, education, work experience, and [RFC], there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10.   The claimant has not been under a disability, as defined in the Social Security Act, since September 20, 2011, the date the application was filed (20 CFR 416.920(g)).

(R. 12-19).

## VI.    DISCUSSION

**A.      Contentions of the Parties**

In his Motion for Summary Judgment, Plaintiff asserts that the Commissioner's decision "is contrary to the law and is not supported by substantial evidence." (Pl.'s Mot. at 1). Specifically, Plaintiff contends that the ALJ erred: (1) when he found that Plaintiff's visual impairments and mental impairments are non-severe in nature and (2) by failing to consider the effects of Plaintiff's non-severe physical and mental impairments on his ability to work. (Pl.'s Br. at 10, 12). Plaintiff asks the Court to reverse the Commissioner's decision. (Id. at 14).

Defendant, in her Motion for Summary Judgment, asserts that the Commissioner's decision "is supported by substantial evidence." (Def.'s Mot. at 1). To counter Plaintiff's arguments, Defendant contends that: (1) substantial evidence supports the ALJ's finding that Plaintiff's visual impairments and mental impairments are non-severe in nature and (2) the ALJ analyzed all of Plaintiff's impairments throughout the sequential evaluation process and accounted for his credible limitations in the RFC assessment. (Def.'s Br. at 7, 9, 11). Defendant asks the Court to affirm the Commissioner's decision. (Id. at 15).

**B.      Scope of Review**

In reviewing an administrative finding of no disability, the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).

Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). However, "it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment . . . if [the] decision is supported by substantial evidence." Hays, 907 F.2d at 1456 (citing Laws, 368 F.2d at 642; Snyder v. Ribicoff, 307 F.2d 518, 529 (4th Cir. 1962)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

**C.     Analysis of the Administrative Law Judge's Decision**

**1.  Whether the ALJ Erred in Determining that Plaintiff's Visual and Mental Impairments are Non-Severe in Nature**

**a.     Visual Impairments**

Plaintiff contends that the ALJ erred in determining that his visual impairments are non-severe in nature. (Pl.'s Br. at 10). Specifically, Plaintiff contends that "the medical evidence of record adequately establishes more than a 'minimal effect' on [Plaintiff's] ability to work." (Id.). Defendant argues that substantial evidence supports the ALJ's determination. (Def.'s Br. at 6).

At step two of the sequential evaluation process, a claimant bears the burden of proving that he or she suffers from a medically determinable impairment that is severe

in nature. <u>Farnsworth v. Astrue</u>, 604 F. Supp. 2d 828, 851 (N.D. W. Va. 2009). When proving that he or she suffers from a medically determinable impairment, the claimant must show more than a "mere diagnosis of condition . . . . [I]nstead, there must be a showing of related functional loss." <u>Pierce v. Colvin</u>, No. 5:14CV37, 2015 WL 136651, at *16 (N.D. W. Va. 2015) (citations omitted). After such a showing, an impairment will be considered severe when, either by itself or in combination with other impairments, it "significantly limits [a claimant's] physical or mental abilit[ies] to [perform] basic work activities." <u>Pass v. Chater</u>, 65 F.3d 1200, 1203 (4th Cir. 1995) (quoting 20 C.F.R. § 416.920). Conversely, an impairment will be considered "'not severe' . . . if it [constitutes] a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with [basic work activities]." <u>Evans v. Heckler</u>, 734 F.2d 1012, 1014 (4th Cir. 1984) (emphasis removed). Basic work activities are "the abilities and aptitudes necessary to do most jobs," including capacities for seeing, hearing and speaking and physical functions such as walking and standing. 20 C.F.R. § 404.1521 (1985).

In the present case, the undersigned finds that the ALJ did not err when determining that Plaintiff's visual impairments are non-severe in nature because Plaintiff did not meet his burden of proof. In his decision, the ALJ documented that Plaintiff has been diagnosed with mild background diabetic retinopathy, early stages of cataracts and glaucoma in both eyes. (R. 12). However, despite these diagnoses, the ALJ found that Plaintiff failed to show any related functional loss. (<u>See</u> R. 12-13). Instead, the ALJ noted that Plaintiff had testified that his vision is blurry only when "he does not have on [his] glasses" and that Dr. Christen documented on March 13, 2012, that Plaintiff did not

experience blurred or double vision during an eye examination. (R. 292). The ALJ

further noted that, on September 20, 2012, Plaintiff was started on Lumigan to treat his

symptoms. (Id.). Finally, the ALJ noted that Plaintiff's most recent eye examinations[6]

revealed that his visual acuity was 20/20 in both eyes. (Id.).

Plaintiff argues that the ALJ failed to consider certain "functional limitations [that]

were introduced and supported by objective evidence." (Pl.'s Reply to Def.'s Br. in

Supp. of her Mot. for Summ. J. ("Pl.'s Reply") at 3, ECF No. 16). Specifically, Plaintiff

points to several sections of his hearing testimony, which describe how: (1) Plaintiff

"[wears] three different pairs of prescription glasses to adjust his eyesight, depending on

the severity of his symptoms;" (2) Plaintiff recalls two days in which his eyeglasses were

ineffective; (3) Plaintiff's vision is "white" for two minutes in the morning and (4) Plaintiff

experiences headaches due to his vision, although ibuprofen treats the pain. (Pl.'s

Reply at 3-4). This testimony, however, does not support a finding of functional loss that

would preclude Plaintiff from performing basic work activities. To the contrary, Plaintiff

reports that he is able to perform activities such as washing laundry, cleaning his porch

and operating a motor vehicle independently.[7] (See R.13, 17). Consequently, the

undersigned finds that the ALJ's determination that Plaintiff's visual impairments are

_____

[6] Plaintiff argues that visual acuity tests "were not the only thing that the ALJ should have
considered when determining functional loss . . . because a visual acuity test may not detect
any intermittent vision problems." (Pl.'s Reply to Def.'s Br. in Supp. of her Mot. for Summ. J.
("Pl.'s Reply") at 3, ECF No. 16). However, in addition to Plaintiff's most recent visual acuity
tests, the ALJ reviewed other evidence, including Plaintiff's hearing testimony and Dr. Christen's
treatment notes, when evaluating Plaintiff's functional loss. (R. 12). Moreover, other than
Plaintiff's hearing testimony in which he recalled only two days when his eyeglasses were
ineffective, Plaintiff has not asserted that his visual impairments are intermittent.
    [7] Plaintiff contends that he cannot perform basic work activities because he no longer
"see the line" to run a skill saw. (Pl.'s Reply at 3). The ALJ considered this statement when
determining that Plaintiff is unable to perform his past relevant work. (See R. 12, 17). However,
it does not follow that Plaintiff lacks the "capacit[y] for seeing" or performing other basic work
activities because he can no longer run a skill saw. 20 C.F.R. § 404.1521.

non-severe in nature is supported by substantial evidence.

**b.    Mental Impairments**

Plaintiff asserts two issues regarding the ALJ's determination that Plaintiff's mental impairments are non-severe in nature. First, Plaintiff argues that the ALJ applied the incorrect legal standard when evaluating his mental impairments and that, had the ALJ applied the correct legal standard, the ALJ would have determined that Plaintiff's mental impairments constitute more than a "minimal effect" on his ability to work . (See Pl.'s Br. at 10-11). Second, Plaintiff argues that the ALJ cherry-picked information from the record when evaluating his mental impairments and thus failed to consider facts "contrary to [his] opinion." (Pl.'s Reply at 5).

**i.    Whether the ALJ Applied the Proper Legal Standard When Evaluating Plaintiff's Mental Impairments**

Plaintiff contends that the ALJ applied an incorrect legal standard when analyzing his mental impairments. (Pl.'s Br. at 11). Specifically, Plaintiff contends that the "slight abnormality test," described in SSR 96-3p, 1996 WL 374181 (July 2, 1996), was the proper legal standard to apply. (Pl.'s Br. at 11). Plaintiff further contends that, had the ALJ applied the correct legal standard, the record would have "establish[ed] [that Plaintiff's mental impairments constitute] more than a 'minimal effect' on Plaintiff's ability to work." (See id. at 10). Defendant argues that the ALJ properly analyzed Plaintiff's mental impairments using the legal standard provided by the Code of Federal Regulations. (Def.'s Br. at 10).

A "special technique" is used when evaluating the severity of mental impairments. 20 C.F.R. § 416.920a (2011). Under this special technique, an ALJ first determines whether a claimant suffers from a medically determinable mental

impairment. Id. at § 416.920a(b)(1). If such an impairment exists, then the ALJ rates the degree of functional limitation caused by that impairment. Id. at § 416.920a(b)(2). To assist an ALJ when rating a claimant's functional limitations, the Code of Federal Regulations provides the following four broad functional areas, known as the "paragraph B" criteria, for the ALJ to consider: (1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace and (4) episodes of decompensation. Id. at § 416.920a(c)(3); Tucker v. Astrue, 897 F. Supp. 2d 448, 464 (S.D. W. Va. Sept. 27, 2012). The Code of Federal Regulations further provides:

> When [an ALJ] rate[s] the degree of limitation in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace), [the ALJ] will use the following five-point scale: None, mild, moderate, marked, and extreme. When [the ALJ] rate[s] the degree of limitation in the fourth functional area (episodes of decompensation), [the ALJ] will use the following four-point scale: None, one or two, three, four or more. . . .
>
> If [the ALJ] rate[s] the degree of [a claimant's] limitation in the first three functional areas as "none" or "mild" and "none" in the fourth area, [the ALJ] will generally conclude that [the claimant's] impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in [the claimant's] ability to do basic work activities.

20 C.F.R. § 404.1520a. When analyzing the four functional areas, an ALJ must consider all relevant objective and subjective evidence. Id. at § 416.920a(b)(1).

In the present case, the undersigned finds that the ALJ used the proper legal standard and applied it correctly. In his decision, the ALJ explicitly stated that, when evaluating Plaintiff's mental impairments, he applied the Code of Federal Regulations' special technique. (R. 13). Using this special technique, the ALJ first determined that Plaintiff suffers from medically determinable mental impairments, including an anxiety disorder and an adjustment disorder with mixed anxiety and depressed mood. (Id.).

Then, the ALJ rated the degree of Plaintiff's functional limitations by considering the four

broad functional areas. (Id.). Regarding the first functional area, the ALJ noted that

Plaintiff's daily activities including administering his own medications, performing his

own personal care, watching television, operating a motor vehicle independently and

performing chores such as washing laundry and cleaning off the porch.[8] (Id.).

Concerning the second functional area, the ALJ noted that Dr. Bettoli documented that

Plaintiff's social functioning is within normal limits and that Plaintiff is generally

personable. (Id.). Additionally, the ALJ noted that Plaintiff shops once a week and

performs odd jobs for a friend. (Id.). As for the third functional area, the ALJ noted that

Dr. Bettoli documented that Plaintiff has "good concentration with normal persistence

and pace." (Id.). The ALJ also noted that Plaintiff is able to pay attention as long as

needed and follow instructions "pretty good." (Id.). Finally, concerning the fourth

functional area, the ALJ noted that Plaintiff experiences no episodes of decompensation

of extended duration. (Id.).

After analyzing each of these functional areas, the ALJ used the appropriate

scales and determined that Plaintiff's limitations are mild in the first two areas and that

Plaintiff possesses no limitations in the latter two areas. (Id.). Because Plaintiff failed to

provide evidence showing that his mental impairments cause more than a minimal

limitation on his ability to perform basic work activities, the ALJ properly concluded that

---

[8] Plaintiff argues that "it is not clear how the ability to watch television, attend to personal care, perform brief house chores, or occasional driving would be substantial evidence of the severity of an individual's anxiety." (Pl.'s Reply at 5). The Code of Regulations, however, has explicitly stated that a claimant's activities of daily living are relevant when evaluating the claimant's degree of functional limitation, which is used to determine whether or not the claimant is capable of performing basic work activities. See 20 C.F.R. § 416.920a. Furthermore, Plaintiff's activities of daily living were only one factor and not the sole basis for the ALJ's determination that Plaintiff's mental impairments are non-severe in nature.

Plaintiff's mental impairments are non-severe in nature. (Id.). Consequently, the
undersigned finds that the ALJ's determination that Plaintiff's mental impairments are
non-severe in nature is supported by substantial evidence.

### ii. Whether the ALJ "Cherry-Picked" Information From the Record

Plaintiff argues that the ALJ "cherry-picked" information from the record when
evaluating his mental impairments and thus failed to consider facts "contrary to [his]
opinion." (Pl.'s Reply at 5). An ALJ's decision must "contain a statement of the case, in
understandable language, setting forth a discussion of the evidence, and stating [his or
her] determination and the reason or reasons upon which it is based." Reid v. Comm'r
of Soc. Sec., 769 F.3d 861, 865 (4th Cir. 2014). However, an ALJ is "not obligated to
comment on every piece of evidence presented." Pumphrey v. Comm'r of Soc. Sec.,
No. 3:14-CV-71, 2015 WL 3868354, at *3 (N.D. W. Va. June 23, 2015); Reid, 769 F.3d
at 865 (stating that "there is no rigid requirement that the ALJ specifically refer to every
piece of evidence in his decision"). Instead, an ALJ need only "provide a minimal level
of analysis that enables [a] reviewing court[] to 'track the ALJ's reasoning.'" McIntire v.
Colvin, No. 3:13-CV-143, 2015 WL 401007, at *5 (N.D. W. Va. Jan. 28, 2015) (quoting
Green v. Shalala, 51 F.3d 96, 101 (7th Cir. 1995)). If an ALJ states that the "whole
record was considered, . . . absent evidence to the contrary, we take her at her word."
Reid, 769 F.3d at 865.

In the present case, the undersigned finds that the ALJ sufficiently discussed the
evidence and his reasons for determining that Plaintiff's mental impairments are non-
severe in nature. When evaluating Plaintiff's mental impairments using the special
technique, the ALJ discussed Dr. Bettoli's disability determination examination,

treatment notes from Wheeling Health Right and Plaintiff's Adult Function Report. (R. 13). While the ALJ did not comment on every piece of evidence presented, he reported that he had "careful[ly] consider[ed] . . . the entire record." (R. 12). Plaintiff points to no evidence that undermines this statement. Indeed, Plaintiff fails to identify any evidence in the record that the ALJ neglected to consider, arguing instead that the ALJ should have more thoroughly discussed the evidence that he unquestionably considered. (See Pl.'s Reply at 5). The ALJ was not required to do so. Instead, the ALJ was required only to provide a minimal level of analysis that would allow a reviewing court to follow his reasoning, which the ALJ supplied. Moreover, Plaintiff has not shown that, had the ALJ recited more facts, the ALJ's decision would have been different. Consequently, the undersigned finds that Plaintiff's contention that the ALJ failed to consider facts contrary to his opinion is without merit.

### c. Harmless Error

An ALJ's failure to find that a specific impairment is severe in nature at step two of the sequential evaluation process constitutes harmless error "if the ALJ 'continued through the remaining steps [of the evaluation process] and considered all of the claimant's impairments.'" Pierce, 2015 WL 136651, at *19. In the present case, the ALJ determined that Plaintiff suffered from two severe impairments, diabetes mellitus and COPD, and therefore continued through the remaining steps of the evaluation process. (R. 12). As he moved through the remaining steps, the ALJ continued to consider Plaintiff's visual and mental impairments in addition to his severe impairments. See Part VI.C.2 (finding that the ALJ considered the effects of Plaintiff's non-severe impairments at steps four and five of the evaluation process). Consequently, assuming *arguendo* that

the ALJ committed an error in determining that Plaintiff's visual and mental impairments are non-severe in nature, such error was harmless and does not require reversal of the ALJ's decision.

### 2. Whether the ALJ Failed to Consider the Effects of Plaintiff's Non-Severe Impairments When Determining the RFC

Plaintiff contends that the ALJ failed to consider his non-severe physical and mental impairments when determining his RFC prior to step four of the sequential evaluation process, resulting in an erroneous RFC determination. (Pl.'s Br. at 12-13). Plaintiff further contends that the erroneous RFC determination in turn resulted in an incomplete hypothetical to the vocational expert and flawed testimony from the vocational expert in step five of the sequential evaluation process. (See Pl.'s Br. at 13). Defendant argues that the ALJ accounted for all of Plaintiff's credible limitations when determining the RFC and that the ALJ's decision as a whole adequately reflects his consideration of Plaintiff's non-severe impairments. (Def.'s Br. at 11).

The ultimate responsibility for determining a claimant's RFC is reserved for the ALJ, as the finder of fact. 20 C.F.R. § 416.946(a) (2011); Farnsworth, 604 F. Supp. 2d at 835. The RFC is what a claimant "can still do despite [his or her] limitations." 20 C.F.R. § 404.1545(a)(1) (2012). More specifically, the RFC is "[a] medical assessment of what an individual can do in a work setting in spite of the functional limitations and environmental restrictions imposed by all of his or her medically determinable impairment(s)." Dunn v. Colvin, 607 F. App'x 264, 272 (4th Cir. 2015). An RFC assessment requires an ALJ to consider "all the relevant evidence" in the record. 20 C.F.R. § 404.1545(a)(1). Therefore, an ALJ must consider both severe and non-severe impairments. Wolfe v. Colvin, No. 3:14-CV-4, 2015 WL 401013, at *6 (N.D. W. Va. Jan.

28, 2015). When reviewing an ALJ's decision, a court must read the "decision as a whole . . . [to evaluate whether the ALJ] consider[ed] the various complaints and limitations [the claimant] reported." See Pearson v. Colvin, No. 2:14-CV-26, 2015 WL 3757122, at *34 (N.D. W. Va. June 16, 2015). For example, if an "ALJ does not specifically discuss [a claimant's impairment or the limitations caused by that impairment] within the RFC assessment section of her decision" but instead discussed them "previously in [step two of] her decision" then the ALJ will be deemed to have considered the impairment and its limitations. Kins v. Comm'r of Soc. Sec., No. 3:14-CV-86, 2015 WL 1246286, at *23-24 (N.D. W. Va. Mar. 17, 2015).

In the present case, the undersigned finds that a review of the ALJ's decision as a whole shows that the ALJ considered Plaintiff's mental impairments when making the RFC determination. Prior to step four of the sequential evaluation process, the ALJ found that Plaintiff has the RFC to perform medium work with certain environmental limitations. (R. 14). The ALJ stated that, in making this determination, he had "considered all [of Plaintiff's] symptoms . . . [to the extent that they] can reasonably be accepted as consistent with the objective medical evidence." (Id.). In his reasoning, the ALJ discussed Plaintiff's testimony that he suffers from anxiety and difficulty sleeping, Dr. Bettoli's disability determination examination and treatment notes from Wheeling Health Right and Wetzel County Hospital where Plaintiff was treated for panic attacks. (R. 15-17). Additionally, the ALJ incorporated his analysis of Plaintiff's mental limitations that he had performed at step two of the sequential evaluation process into his reasoning at step four.[9] (See R. 16). Therefore, the ALJ clearly considered Plaintiff's

---

[9] The ALJ clearly revealed his intention to incorporate his step two analysis into his step four analysis in two of his statements. First, the ALJ stated in his step two analysis that "the

mental impairments and limitations when making the RFC determination.

Furthermore, the undersigned finds that a review of the ALJ's decision as a whole shows that the ALJ considered Plaintiff's visual impairments when making the RFC determination. In his step four analysis, the ALJ noted Plaintiff's testimony that he "cannot climb on roofs" due to his eyesight. (See R. 15, 28). However, the ALJ also noted that Plaintiff was "not entirely credible" regarding the severity of his symptoms. (R. 15). While the ALJ did not further discuss Plaintiff's visual impairments in his step four analysis, he did not need to because he had thoroughly discussed them at step two, when he determined that Plaintiff's visual impairments cause no functional loss. See Part VI.C.a (describing the ALJ's reasoning for finding Plaintiff's visual impairments non-severe in nature). Moreover, the ALJ noted in his step four analysis that despite Plaintiff's visual limitations, Plaintiff is capable of operating a motor vehicle independently, performing "odd jobs" with a friend, shopping and performing chores such as washing laundry and cleaning his porch. (R. 17). The ALJ's RFC determination thus appears to appropriately reflect what Plaintiff is capable of doing despite his visual impairments. Consequently, the undersigned finds that the ALJ's RFC determination is supported by substantial evidence.

## VII.    RECOMMENDATION

For the reasons herein stated, I find that the Commissioner's decision denying Plaintiff's application for SSI benefits is supported by substantial evidence. Accordingly, I **RECOMMEND** that Plaintiff's Motion for Summary Judgment (ECF No. 10) be

---

[RFC] assessment below [at step four] reflects the degree of limitation I have found in the "paragraph B" mental functional analysis." (R. 14). Second, the ALJ stated in his step four analysis that "[a]s noted above [at step two], the evidence supports finding [that Plaintiff] has no severe mental impairment." (R.16). Thus these two sections plainly reference each other and are intended to be read in conjunction with each other.

**DENIED**, Defendant's Motion for Summary Judgment (ECF No. 14) be **GRANTED**, the decision of the Commissioner be affirmed and this case be **DISMISSED WITH PREJUDICE**.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objections are made and the basis for such objections. A copy of such objections should also be submitted to the Honorable John Preston Bailey, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841, 845-48 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140, 155 (1985).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted this 24th day of September, 2015.

ROBERT W. TRUMBLE
UNITED STATES MAGISTRATE JUDGE